## STEPHENS RANCH & LIVE STOCK CO. v. UNION PAC. R. CO.

No. 2849.   Decided November 21, 1916 (161 Pac. 459).

1.  WATERS AND WATER COURSES—DIVERSION OF STREAMS—FLOODING LANDS.  Though defendant by erecting a dam and maintaining it for over thirty years may have acquired a prescriptive right to divert the flood waters of the stream, he is not entitled to a directed verdict in an action by lower owners for damages caused by the diversion, where there is evidence that the original dam was raised and diversion increased.  (Page 534.)

2.  WATERS AND WATER COURSES—DIVERSION OF STREAMS—PROSPECTIVE RIGHTS.  After the dominant owner has acquired a prescriptive right to divert water of a stream by erection and maintenance of a dam, he cannot further injure the servient estate by increasing the height of the dam and the diversion of the water onto plaintiffs lands.  (Page 535.)

3.  APPEAL AND ERROR—SCOPE—CONFLICTING EVIDENCE.  The finding of the jury on a direct conflict in the evidence is conclusive on the court on appeal.  (Page 535.)

4.  APPEAL AND ERROR—SCOPE—PRESERVATION OF EXCEPTION—GENERAL EXCEPTIONS.  The objection that testimony is incompetent, irrelevant, and immaterial does not save the objection that the witnesses were not properly qualified to testify.  (Page 536.)

5.  DAMAGES—EXCESSIVE DAMAGES—EVIDENCE.  The mere fact that the jury allowed a verdict in excess of the amount warranted

by the evidence does not alone warrant the inference that the verdict was based on passion and prejudice unless the amount is so grossly excessive that it shocks the ordinary man's sense of justice.   (Page 539.)

Appeal from District Court, Third District; *Hon. Geo. G. Armstrong,* Judge.

Action by the Stephens Ranch & Live Stock Company against the Union Pacific Railroad Company.

Judgment for plaintiff.   Defendant appeals.

AFFIRMED.

*George H. Smith, J. V. Lyle, B. S. Crow* and *A. R. Robertson,* for appellant.

*·Evans, Evans & Folland* and *P. H. Neeley* for respondent.

FRICK, J.

The plaintiff, a corporation, brought this action against the defendant to recover damages to growing crops and to its lands which, it is alleged in the complaint, were caused by the defendant in constructing certain dams across a natural water course, and thereby causing the annual flood waters flowing therein to be diverted through an artificial ditch and cast upon plaintiff's lands.

The complaint, originally contained three causes of action. The first one, however, was dismissed at the time of trial, and therefore is out of the case.   In the second cause of action plaintiff, in substance, alleged that it was the owner and in possession of certain lands in Summit county, which were fully described, and which, it is alleged, are located along the Weber river and adjacent to the line of railroad owned and operated by the defendant; that Anderton creek is a natural water course having its source in the mountains lying north and east of the lands in question; that said Anderton creek, in its natural course, would carry the annual flood waters accumulating therein into the Weber river and away from plaintiff's lands; that in the year 1909 the defendant

530        SUPREME COURT OF UTAH.        [Nov.

Stephens Ranch & Live Stock Co. v. Union Pac. R. Co., 48 Utah 528.

"wrongfully and in violation of plaintiff's rights constructed a dam across the channel of the said Anderton creek at a point above the plaintiff's premises, * * * by reason of which the said waters of the said creek were diverted from their natural channel"; that the defendant, immediately above said dam and connecting with said creek, had also constructed an artificial channel or ditch "in such a way as to cause all the waters of said Anderton creek to flow over and upon plaintiff's premises," and that said water carried and deposited large quantities of earth, gravel, sand, and debris upon plaintiff's lands; that in the year 1913 the defendant constructed another dam or dike across said creek which caused the natural flood waters thereof to flow through the artificial channel or ditch aforesaid upon and over plaintiff's lands and to deposit thereon large quantities of gravel, sand, and debris which obliterated and destroyed plaintiff's irrigating ditches and injured plaintiff's fences and caused permanent injury to its lands to its damage in the sum of $2,000. In the third cause of action the allegations respecting the natural water course, the construction of the dams and the artificial channel or ditch, and the casting of the water by means of said dams and ditch upon plaintiff's said lands, and that said waters damaged and destroyed plaintiff's growing crops in 1910, and in the subsequent years and obliterated its irrigating ditches, etc., were reiterated, and damages in the sum of $4,000 were claimed in said third cause of action. The complaint also contained allegations to the effect that the conditions and surroundings were such that the defendant well knew that the doing of the things complained of would result in injury and damage to the plaintiff's lands, growing crops, etc.

The defendant filed an answer in which it denied that it wrongfully did the things complained of; denied that plaintiff was damaged by reason of its acts, or at all; denied that it wrongfully diverted the waters from the Anderton creek, which it admitted was a natural water course as alleged in the complaint. The defendant, in substance, further averred that it had acquired a prescriptive right or easement to divert the waters from Anderton creek by means of the dams and

the artificial channel or ditch mentioned in the complaint, and also averred that the dams and ditch were constructed upon lands originally owned by the defendant; that the lands of plaintiff lie below said ditch, and that the plaintiff acquired all of its lands long after the original dam was placed in the creek, which was placed therein in the year 1870; that the dams constructed in 1909 and 1913 were not new dams, but in fact constituted no more than a reconstruction of the old original dam which had been practically washed out and had become useless; that plaintiff's lands were servient and subject to defendant's easement or prescriptive right; that the injury and damage complained of were caused by unusual and unprecedented cloud-bursts over which the defendant had no control, and hence was an act of God.

At the trial the defendant admitted in open court that the plaintiff is, and during all of the times mentioned in the complaint was, the owner of the lands in question, except that portion thereof covered by its right of way.

The following rough sketch or plat will aid the reader to a better understanding of the situation:

The northwest quarter of section 33, marked "A" on the plat, in the year 1870, and for some time thereafter, was owned by the defendant, and is now owned by a Mrs. Anderton, except a small strip off the west end. The northeast quarter of section 32, lying to the west of section 33, is owned by the plaintiff, including the small strip off section 33 afore-

said. Anderton creek, marked ''Creek'' on the plat, is the natural water course mentioned in the pleadings. Its source is to the northeast in the mountains, and it flows southwesterly, and if its waters are not diverted it will empty them into in Weber River as indicated on the plat. Weber River flows in a westerly direction. The strip marked ''R. R.'' constitutes the defendant's right of way. The channel marked ''Ditch'' on the plat is the artificial channel or ditch constructed by the defendant in 1870 when it constructed the railroad. The dam and ditch were constructed to divert the water from Anderton creek to the west. The heavy black lines marked ''D1,'' ''D2,'' ''D3,'' represent the dams and dike before mentioned. In 1870, in order to divert the annual spring and summer floods which are caused by the melting snows in the spring and heavy rainstorms during the summer, the defendant constructed the artificial water course marked: ''Ditch'' and the dam marked ''D1.'' The dam, it appears, was at times partly washed out by the floods, but it nevertheless was replaced and kept in repair by the defendant until 1909, when it was completely washed out by a heavy storm, and was in that year replaced by what plaintiff's witnesses say was a larger dam, marked ''D2'' on the plat. The latter dam was again repaired, and, it seems, further enlarged, in 1913, at which time there was also constructed a dike, which is marked ''D3'' on the plat. The defendant diverted the flood waters of Anderton creek through the ditch by means of the dam marked ''D1'' continuously from 1870 until 1909 for the purpose of protecting the defendant's track and road at the point where the same crosses Anderton creek, at which point the track passes through a cut. At least a large portion of the flood waters of Anderton creek were thus discharged westerly through the ditch at a point some distance east of the west boundary line of section 33 since the year 1870. In that year, and for some years thereafter, all of section 33 was owned by the defendant, and it thus constructed the ditch and discharged the flood waters of Anderton creek upon its own lands. Many years before 1909—the exact time is not shown—plaintiff's predecessors in interest purchased the lands lying in section 32, which are marked S on the plat.

Plaintiff obtained the title to the lands in section 32, including the small strip in section 33, some six or eight years prior to 1909, during all of which years the flood waters of Anderton creek, but, as plaintiff claims, without much injury or damage to its lands, were discharged at the point before stated by means of the dam and ditch constructed in 1870.

In view of the foregoing it was strenuously contended at the trial, and is now insisted, by the defendant that it had acquired a prescriptive right to divert and discharge the flood waters of Anderton creek at the point indicated on the plat, that the plaintiff had acquired the lands with full knowledge of defendant's rights and of the prevailing conditions respecting the diversion of said waters, and that for those reasons plaintiff's lands are burdened with its right or easement to divert and discharge the flood waters of Anderton creek as before stated.   Upon the other hand, plaintiff contends that, while it may be true that it had acquired its lands subject to the right of the defendant to maintain the dam constructed in 1870, and by means of it and the ditch aforesaid to divert all of the flood waters of Anderton creek that would be diverted by means of that, or another one of the same dimensions, yet that, inasmuch as defendant, in 1909, and again in 1913, had constructed larger and higher dams across Anderton creek, and by such means had diverted larger quantities and practically all of the flood waters of Anderton creek to the artificial channel or ditch, and by reason thereof had caused such increased flood waters to carry and deposit large quantities of gravel, sand, and debris onto plaintiff's lands (all of which would not have occurred if a dam no larger than the one constructed in 1870 had been maintained), and by reason of which its irrigating ditches were filled up and obliterated, its growing crops damaged and destroyed, its fences injured and a portion of its lands permanently damaged, for those reasons defendant's contentions cannot prevail.   Whether the defendand had, in 1909, and in 1913, enlarged and raised or elevated the dam of 1870, and by reason thereof had caused larger quantities of the annual flood waters of Anderton creek to be diverted through the ditch and discharged upon plaintiff's lands, causing the damages claimed by it, were the prin-

cipal issues litigated at the trial. One of the principal stockholders of the plaintiff, in speaking of the old dam of 1870 and the one put in in 1909, and in 1913, said:

"We raised no objection to the old dam—if they had left the old dam as it was, and had not built new dams. We object to the new dams, not the old one."

There is much evidence to the effect that the dam of 1909 was placed farther up the stream and made three feet higher than the dam of 1870, that it was longer and larger, and that it caused much larger quantities of the annual flood waters of the creek to be diverted through the ditch and discharged upon plaintiff's lands.

When the evidence was all in, defendant's attorney moved the court to direct the jury to return a verdict for the defendant upon the ground that the evidence was undisputed that the defendant had acquired a prescriptive right or easement to divert the flood waters of Anderton creek through the artificial channel or ditch, and that when the plaintiff had acquired its lands it had full knowledge of the prevailing conditions, and therefore had acquired its lands subject to plaintiff's prescriptive right or easement aforesaid. The court denied the motion, and counsel now predicate error upon the ruling.

We are unable to yield assent to counsel's contention. In our judgment, there is not only some substantial evidence, but there is ample evidence, in support of the contention that the dam of 1870 was in the year 1909, and again in 1913, enlarged and made higher, and that by reason thereof much larger quantities and practically all of the annual flood waters of Anderton creek were thereby diverted from said creek through the ditch and were cast upon the plaintiff's lands, and that by reason of the increased flow the damages complained of were caused. The court therefore did not err in refusing to direct a verdict in favor of the defendant for the reason stated.

Nor can defendant's contention prevail upon the ground that it had acquired a prescriptive right or easement to divert and cast all of the annual flood waters of Anderton creek upon plaintiff's lands. If it be conceded that by the construction

of the dam of 1870 the defendant had acquired a prescriptive right to burden plaintiff's lands by casting the annual flood waters of Anderton creek thereon to the extent that such waters would be diverted by the dam of 1870, or by some other dam of the same dimensions, yet it did not acquire any right to enlarge and elevate that dam, and by such enlargement and elevation increase the flow of flood waters onto and over plaintiff's lands. That a prescriptive right or easement to divert the flood waters of a natural water course by continuous user for a sufficient length of time (in this state 20 years) may be acquired by a dominant owner is now well settled. *Holm* v. *Davis,* 41 Utah, 202, 125 Pac. 403. But it is equally settled that after a prescriptive right or easement has been acquired by a dominant owner the means of diversion used by him may not be changed or enlarged so as to materially increase the flow of water to the detriment of the servient owner. The law is further well settled that when one acquires lands which are burdened with such an easement or prescriptive right he takes them subject to such right, but he is not also bound to submit to a material change or enlargement of the right by the dominant owner if thereby the servient estate is injured to a larger extent than it was under the right as it existed when the servient estate was acquired. It is not necessary to cite or review a large number of cases upon this point. See *Greeley Irr. Co.* v. *Van Trotha,* 48 Colo. 12, 108 Pac. 985; *Manier* v. *Myers and Johns,* 43 Ky. (4 B. Mon.) 514; s. c. 45 Ky. (6 B. Mon.) 132; *Schumacher* v. *Brand,* 72 Wash. 543, 130 Pac. 1145; 2 Farnham, Waters and Water Rights, section 542, and cases cited. Nor do the cases cited by defendant's counsel lay down a different rule. Indeed, in the case of *Hagge* v. *Kansas C. S. R. R. Co.* (C. C.) 104 Fed. 391, cited by them, the foregoing doctrine is clearly stated and maintained.

It is further contended, stating the contention in counsel's own words, that:

"Plaintiff's damage was the result of an extraordinary cloud-burst, which was an act of God, and for which defendant was not liable."

Upon that question the evidence is in conflict, and the court

536          SUPREME COURT OF UTAH.          [Nov.

Stephens Ranch & Live Stock Co. v. Union Pac. R. Co., 48 Utah 528.

therefore was required to submit the matter to the jury; and their finding, being against defendant, is conclusive on this appeal.

It is also insisted that the court erred in admitting certain evidence in plaintiff's favor. Counsel in their brief contend that the evidence was erroneously admitted because "the witnesses were not experts," but were, nevertheless, permitted to give their judgment or opinion respecting certain matters. Counsel for respondent insist that we are not authorized to review this assignment because the objections to the questions propounded to the witnesses were insufficient to cover the alleged error. The grounds of the objections as they appear from the bill of exceptions, are that the evidence is "irrelevant, immaterial, and incompetent." That is the objection the trial court was required to pass on, and none other. It is now well settled that such grounds of objection are not sufficient to authorize an appellate court to pass upon the competency of the witness or his qualifications to testify. In 5 Jones, Commentaries on Evidence, section 894, at page 375, the author, in discussing the subject now under consideration, says:

"An objection that evidence is incompetent, irrelevant, and immaterial does not cover the ground that the witness has not shown himself competent to testify as to the value as an expert."

For the reasons stated, therefore, this assignment cannot prevail. The evidence complained of was, however, hardly of that character which would authorize us to reverse the judgment.

It is further contended that the court erred in refusing to grant a new trial upon the ground that the verdict is the result of passion or prejudice, or both. This, in the judgment of the writer, is really the only serious question presented on this appeal. The question arises as follows: As we have seen, the plaintiff demanded judgment for $2,000 on the second cause of action and for $4,000 on the third. The court, apparently upon the defendant's request, instructed the jury to specify in their verdict the amount they allowed as damages for the growing crops, etc. The jury returned the following verdict:

"We, the jurors impaneled in the above case, find the issues of this action in favor of the plaintiff and assess its recovery at the sum of $1,000 for the damages resulting from permanent injury to the land, and $2,250 for the damages resulting to the personal property."

After the return of the verdict, and within the time allowed by our statute, defendant moved for a new trial upon the ground that the damages allowed were excessive and appeared to be the result of passion or prejudice. Counsel for the respective parties, apparently at the court's request, made a careful examination into the evidence, and it was agreed between them that the evidence was insufficient to sustain a verdict for the aggregate amount allowed by the jury, namely, $3,250, but that the evidence was sufficient to sustain a verdict for the amount of $1,882.50. The court accordingly required the plaintiff to either remit the difference between $3,250 and $1,882.50, or to submit to a new trial. The plaintiff thereupon agreed to remit the amount of the difference aforesaid, and the court ordered the remittitur entered, and then ordered judgment for $1,882.50, and denied the motion for a new trial.

It is strenuously insisted that, in view that the jury returned a verdict for so large an amount in excess of the evidence, it clearly indicates that the verdict was the result of passion or prejudice, or both, and therefore the verdict is tainted as a whole. It is quite true that, where it is made to appear that the verdict is excessive, and that such excess is the result of passion and prejudice, or either, the error cannot be cured by remitting the excess from the verdict. In the nature of things that must be so, because every other question of fact which is involved in the controversy, and which is included in the verdict, must therefore be tainted. But it does not necessarily follow that because the jury returns a verdict in which a greater sum is allowed than is authorized by the evidence for that reason alone the verdict is the result of passion or prejudice. If such were the rule, all cases in which excessive verdicts are returned would have to be retried. In *Jensen* v. *Denver & R. G. R. Co.*, 44 Utah, 100, 138 Pac. 1192, 1193, this court has clearly indicated

under what circumstances the amount of the verdict may be reduced and when a new trial because of an excessive verdict may be granted. Necessarily upon such a question appellate courts must, to a large extent, rely upon the judgment and discretion of the trial court. That court is in a much better position to observe and determine whether a jury was actuated by passion or prejudice, or by both, in returning a verdict for an amount larger than the evidence justifies, or whether the jury was merely mistaken with regard to the amount that should have been allowed. The jury may merely have misjudged the evidence, or may have erred in their judgment respecting the amount that should be allowed, and if such is the case the whole verdict is not tainted, and the error may be cured by requiring the plaintiff to remit the excess. To that effect are all of the modern authorities. In *Gila Valley, G. & N. Ry. Co. v. Hall*, 13 Ariz. 270, 112 Pac. 845, what we deem to be the correct rule is stated by the Supreme Court of Arizona in the fifth headnote, thus:

"Unless it clearly appears from the court record that an excessive verdict in a personal injury action resulted from prejudice or passion rather than an undue liberality exercised by the jury in awarding damages, the trial court's action in remitting a part of the verdict instead of granting a new trial will not be disturbed."

See, also, *Dashiel* v. *Harshman*, 113 Iowa, 283-296, 85 N. W. 85; *Davis Iron Works* v. *White*, 31 Colo. 82, 71 Pac. 384; *Tunnel & M. L. Co.* v. *Cooper*, 50 Colo. 390, 115 Pac. 901, Ann. Cas. 1912C, 504. In the latter case, in a footnote commencing on page 509, of Ann. Cas. 1912C, numerous instances are given where the appellate courts have approved the actions of the trial courts in requiring a remittitur of the excessive amount allowed by the jury. In many of the cases there related the excess was much greater than in the case at bar, and notwithstanding that fact the order requiring a remittitur was nevertheless sustained, and the judgment was upheld.

We can discover nothing in this case, except the amount allowed, which indicates passion or prejudice, and, as we have seen, passion or prejudice may not be inferred alone from the fact that an excessive amount is allowed by a jury unless the amount is so grossly excessive that it shocks the

ordinary man's sense of justice. In this case the evidence upon the question of damages was, to say the least, somewhat scattered, and it is not to be greatly wondered at that a jury composed of laymen, who are required to rely entirely upon their memory respecting the amount that should be allowed, in view of the evidence, should arrive at a verdict which goes beyond the evidence. The case seems to have been well and fairly tried, and the court submitted the case to the jury according to the defendant's theory, and charged the jury as requested by it, except in one particular, and in that one the substance of defendant's request was given. While the writer, upon the last question discussed, entertained some doubt at the hearing, yet, after going into the authorities rather carefully, no reason is discovered why the judgment of the trial court upon this assignment should not prevail.

The further contention that a new trial should have been granted for the reason that the jury disregarded the court's instructions upon the question of defendant's prescriptive right or easement cannot prevail. As already stated, all the questions were fairly submitted to the jury, and the evidence fully justifies their findings, except upon the question of damages, and that question we have already disposed of.

The judgment therefore should be, and it accordingly is, affirmed, with costs to respondent.

STRAUP, C. J. (concuring).

I concur in the result. I do not concur in what is said that a new trial must be granted in all cases where it appears that an excessive verdict was rendered under passion or prejudice, and that the court in no such case is justified in refusing a new trial on a remission of the excess. Because of the conclusion here reached that the verdict was not the result of passion or prejudice, what is said as to this is but dicta. I thus withhold my views respecting it until in a case the matter is involved and properly presented for consideration and decision.

McCARTY, J.

In the main I agree with the reasoning of, and the conclu-

sions reached by Mr. Justice FRICK, but I do not concur with him wherein he holds:

"That where it is made to appear that the verdict is excessive and that such excess is the result of passion or prejudice, or either, the error cannot be cured by remitting the excess from the verdict."

As stated by the CHIEF JUSTICE, this question is not necessarily involved in this case, and hence I refrain from expressing an opinion thereon.